**Robert Bruce RECKMEYER, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Misc. No. 88–02–A.
Crim. No. 85–00010–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 5, 1989.

---

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This Section 2255 Petition to Vacate Sentence tells a bizarre story of avarice, duplicity, and lawyer misconduct. Petitioner contends that his lawyer's conduct violated his Fifth and Sixth Amendment rights to effective, conflict-free counsel. Specifically, petitioner alleges that his lawyer, John M. Dowd, threatened and coerced him into paying large, exorbitant fees, and then counseled and encouraged him to pay these fees using drug trafficking funds and to use deceptive means to conceal their source. On one occasion, petitioner, with Dowd's knowledge and encouragement, arranged for $100,000 of drug money to be smuggled into the country from the Bahamas for the purpose of satisfying, partially at least, Dowd's oppressive fee demands. This incident was ultimately included in the indictment as one of the overt acts of petitioner's conspiracy with others to possess and distribute marijuana and hashish. Thus, claims petitioner, his lawyer had independent personal knowledge of facts underlying one of the charges against petitioner, a charge on which the lawyer also faced potential criminal liability. This circumstance, according to petitioner, created an actual conflict of interest that deprived him of his constitutional right to effective, conflict-free counsel. The government disagrees, contending that no actual conflict existed because petitioner and his lawyer had the same objective, namely dismissal of the charge or acquittal. The government also argues that petitioner cannot show any actual prejudice and, in any event, knowingly waived his right to conflict-free counsel.

Procedurally, this matter is properly before the Court on a motion to dismiss pursuant to Rule 12(b)(6) Fed.R.Civ.P. Rule 12 of the *Habeas* Rules [1] permits district courts to "proceed in any lawful manner not inconsistent with these rules ... and to apply the Federal Rules of Criminal Proce-

William B. Moffitt, Lisa Bondareff Kemler, Kerry C. Connor, Alexandria, Va., for petitioner.

William G. Otis, Asst. U.S. Atty., Alexandria, Va., for respondent.

---

1. Rules Governing Section 2255 Procedures in the United States District Courts.

dure or the Federal Rules of Civil Procedure, whichever it deems more appropriate." District Court discretion to use the federal civil or criminal rules in resolving § 2255 petitions was endorsed by the Supreme Court in *United States v. Frady*, 456 U.S. 152, 166–168 n. 15, 102 S.Ct. 1584, 1593–1594 n. 15, 71 L.Ed.2d 816 (1982). There, the Court quoted the Advisory Committee Notes in observing that the drafters of the *Habeas* Rules intended to "allow the court considering the petition to use any of the rules of civil procedure (unless inconsistent with these rules of *habeas corpus*) when in its discretion the court decides they are appropriate." *Id.* Here, Rule 12(b)(6) is manifestly appropriate as a means of testing the legal sufficiency of petitioner's allegations. The government contests the legal sufficiency of the petitioner's allegations even assuming they are true. Thus, no evidentiary hearing would be required unless the Court determines that the allegations in the petition, if true, entitle the petitioner to relief. The practical value of Rule 12 in this context is obvious. Not surprisingly, numerous courts have employed Rule 12, Fed.R.Civ.P. in similar circumstances.[2]

The question presented, therefore, is whether petitioner's allegations, if true, state a claim for constitutional relief. For the reasons set forth in this Memorandum Opinion, the Court concludes (i) that petitioner's counsel had an actual conflict of interest, (ii) that petitioner though not required to show actual prejudice, has nonetheless made the requisite showing of adverse impact on counsel's performance, but (iii) that petitioner knowingly waived his

right to object to a conflict-free counsel. Accordingly, the Petition is denied.

*Background*

(1) *The Indictment and Plea*

Petitioner and his twenty four indicted co-conspirators[3] were charged in a one hundred and one (101) page, forty eight (48) count indictment with a variety of charges relating to a major, long-standing marijuana and hashish importation and distribution enterprise. Petitioner was named in twenty four (24) counts, including the lead count, a thirty five (35) page drug conspiracy charge. The government, it appears, had amassed a powerful case against petitioner. In March 1985, at the Rule 11 plea hearing, the government represented to the Court, and petitioner agreed under oath, that had the case gone to trial, the prosecution would have proved its case beyond a reasonable doubt.[4] Specifically the government would have proved that during the period 1972 through 1977 petitioner distributed large amounts of marijuana, ranging from fifty (50) to one hundred (100) pounds per month. Even larger amounts are attributable to petitioner for the 1978 through 1983 period. The government would have proved, through eyewitness testimony of petitioner's employees, that during this period petitioner was the leader and supervisor of an organization responsible for distribution of more than 25 tons of marijuana and eight tons of hashish in this district and elsewhere. The testimony of employees and co-conspirators would also have established that petitioner derived substantial revenues from these illegal ventures. Specifically, the government was prepared to prove that

---

**2.** *See e.g., Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir.1985) (dismissal of § 2254 claims pursuant to Rule 12(b)(6), Fed.R.Civ.P.); *Breeze v. Trickey*, 824 F.2d 653 (8th Cir.1987) (same); *Adams v. Lankford*, 788 F.2d 1493 (11th Cir. 1986) (same); *Bond v. Procunier*, 780 F.2d 461 (4th Cir.1986) (same); *Jones v. State of Maryland*, 584 F.2d 663 (4th Cir.1978).

Also of interest are decisions employing other civil rules. *See United States v. Quin*, 836 F.2d 654 (1st Cir.1987) (applying Rule 11, Fed.R.Civ. P.); *Lovern v. United States*, 689 F.Supp. 569 (E.D.Va.1988) (allegations of complaint analyzed under Rule 52, Fed.R.Civ.P.).

**3.** There were also a number of unindicted co-conspirators.

**4.** The facts related here are condensed from the government's statement of the factual basis for the plea as modified and assented to by petitioner and Dowd at the time of the plea hearing. *See* Transcript of Plea Hearing, dated March 13, 1985 at 17–24. The facts related here are also included in a Statement of Facts appended to the Plea Agreement and signed and adopted with oral changes by petitioner and Dowd. The oral changes are reflected in this recounting.

petitioner's organization generated more than $25,000,000 in gross revenues from which petitioner realized at least $4,000,000 in profits. According to the government's proof, receipts from the drug trade were also used to purchase a variety of substantial assets, including real estate. The government's proof would also have shown that a substantial amount of U.S. currency, a sum in excess of $5,000,000, was transported to places outside the United States, including The Bahama Islands, and that this occurred without submission of the reports required by United States currency laws. The government's proof would also have established that petitioner formed a Maryland corporation, United Trade, Inc., and used it to launder illegal drug profits. In this connection, petitioner signed and submitted a false income tax return for United Trade, Inc., knowing that it substantially overstated the company's gross receipts and that it did so to conceal the company's role in petitioner's scheme to launder drug proceeds.

Nor is this all. The government's proof would also have shown that petitioner purchased from co-conspirators approximately 13,000 pounds of hashish in June, 1980. In connection with this transaction, the government was prepared to prove that petitioner directed the transfer of $1,880,-000 from Virginia to South Carolina in partial payment for the more than six and one-half tons of drugs. Additional payment was made by petitioner delivering to a co-conspirator a 6.08 carat ruby. Finally, the government's case included proof that in November 1981, petitioner caused a co-conspirator to take possession of five Uzi 9mm automatic weapons, together with silencers and ammunition. Petitioner later took custody of some of these weapons.

The government's evidence, summarized above, was set forth in a written factual summary and stated orally at the plea hearing in March, 1985. Petitioner signed the factual summary to indicate his concurrence. And, as the following excerpt from the plea colloquy reflects, he also confirmed orally that the government's evidence was accurate.

BY THE COURT:

Q Mr. Reckmeyer, do you want to come to the podium, please, sir. You signed the plea agreement, you did so after talking to your counsel, Mr. Dowd; is that correct?

A Yes, sir.

Q You also signed this factual summary, is that right, after talking to Mr. Dowd? You signed that also?

A Yes, sir.

Q With the corrections that Mr. Dowd has made, do you agree that is what happened in this case?

A I do, sir.

Q On the basis of what Ms. Tandy has said and what's been corrected by Mr. Dowd that was your participation in these offenses; is that correct?

A Yes, sir.

Q Any other additions or corrections that you want to make, other than what Mr. Dowd has told me this morning:

A No, sir.

Q Do you still wish to plead guilty in this case?

A I do, sir.

Q Do you plead freely and voluntarily?

A I am, sir.

Q Have you understood all the questions that I have asked you?

A Yes, sir.

Transcript of Plea Hearing, dated March 13, 1983 at 24–5.

Thus, at the time of the plea, petitioner was a principal focus of a 48 count, 101 page indictment charging him and others with a conspiracy to smuggle into the United States and distribute here vast quantities of marijuana and hashish generating more than $25,000,000 in revenue and $4,000,000 in profits over more than a decade of activity. Petitioner was also charged with automatic weapons violations and violations of currency and tax laws. He admitted all this; he also admitted the

government's ability to prove it. Twenty four of the forty eight counts named petitioner. As a result, he faced a massive risk, including a potential for more than one hundred years imprisonment plus as much as life imprisonment on the single count charging him with a Continuing Criminal Enterprise (CCE), 21 U.S.C. § 848. Rather than run this risk, petitioner elected to accept the plea bargain Dowd negotiated for him—in essence, a plea to four of the 24 counts against him and, more importantly, a 20–year sentencing cap. Part of the plea also included that among the 20 counts dropped by the government would be the lead count, the 35 page drug distribution conspiracy charge. The attractiveness of the 20 year sentencing cap was obvious, given that the maximum penalty for the CCE charge was life imprisonment without parole. Under the circumstances, it is not difficult to understand petitioner's decision to accept the plea agreement.

### (2) *The Sentence and Rule 35 Reduction*

Petitioner was sentenced to 17 years imprisonment on the CCE charge. He was further sentenced to two years on the illegal firearms count, two years on the currency violation charge and three years on the false income tax charge. These three sentences were imposed to run concurrently with the sentence of 17 years on the CCE charge. The sentencing judge recommended incarceration at a Level II institution. At the sentencing hearing, petitioner exercised his allocution right. He expressed remorse. He also conceded that the Court had been fair in listening to him and his counsel.

Less than four months later, the petitioner, represented by new counsel, filed a motion for reduction of sentence pursuant to Rule 35, Fed.R.Crim.P. This motion succeeded. The sentencing judge reduced the sentence to 14 years and recommended incarceration in a Level I institution.

### (3) *Petitioner's § 2255 Allegations*

In the course of the plea hearing, petitioner was asked whether he was satisfied with Dowd's services as his counsel. His unequivocal answer was, "Very much so, your Honor." Transcript of Plea Hearing, dated March 13, 1985 at 9. This answer was far from truthful if as is assumed here petitioner's § 2255 allegations are true. Indeed, it appears from the allegations that petitioner's relationship with Dowd was marred at the outset by the latter's insistence on a large first installment payment on the fee. As the allegations make clear, matters went progressively downhill after this unpromising beginning. Dowd continually pressured and coerced petitioner into paying more and more in fees, ultimately arranging for petitioner to make multiple smaller payments under false names to conceal the source and avoid currency reporting regulations. Dowd also knew the funds were proceeds of illegal drug trafficking smuggled into this country from the Bahamas in violation of currency laws. This state of affairs hardly squares with petitioner's statement at the plea hearing. Moreover, this summary of the allegations does not do justice to the complete lurid picture to which we now turn.

In April 1983, according to the § 2255 allegations, petitioner became aware of a grand jury investigation focusing, at least partly, on his activities. He retained Dowd, then a Whitman and Ransom partner and a former federal prosecutor, to represent him in connection with the grand jury matter. At their first meeting, Dowd advised petitioner that a $100,000 retainer would have to be paid. Petitioner agreed, believing no further fees would be required. Shortly after the initial interview, petitioner paid Dowd $90,000 toward the retainer. This money, he claims, was derived from legitimate sources, $15,000 borrowed from his brother, $10,000 from his father and the balance from his "corporate, personal and retirement accounts." Petition dated June 24, 1988 at ¶ 3 ("Petition"). After agreeing to pay the retainer, petitioner related to Dowd the facts and circumstances concerning the criminal conduct for which he was ultimately indicted. He also disclosed to Dowd his assets and financial condition. Approximately two weeks after the initial interview and after petitioner had confided in Dowd concerning his crimi-

nal involvement, Dowd informed petitioner that a fee of $500,000 would be required for Dowd to continue to represent petitioner in the case. Having already paid $90,000, petitioner "felt locked into Mr. Dowd." Petition at ¶ 4. He told Dowd that he had exhausted his legitimate funds and that the only money left was proceeds from illegal activities. Despite hearing this, Dowd instructed petitioner to deliver $300,000 or $400,000 in cash.

Over the following months, Dowd continued to press for payment, threatening to withdraw unless the money was paid. Responding to this, petitioner set out to sell his farm to use the proceeds to defray Dowd's fee. Just prior to closing, however, the government seized petitioner's $195,000 equity interest in the farm.

Dowd continued to pressure petitioner to pay more toward the fee. To satisfy these demands, petitioner, with Dowd's knowledge, began making payments to Whitman and Ransom, Dowd's law firm, using $5,000 cashier checks purchased in a false name. At least 22 of these cashier's checks were delivered to the law firm.

In June 1984, after petitioner had paid a total of approximately $200,000, Dowd left Whitman and Ransom and joined the firm of Heron, Burchette, Ruckert and Rothwell. Dowd continued to press petitioner for fee payments threatening again to withdraw representation unless petitioner put $250,000 into his trust account. This continued on almost a daily basis even though petitioner had earlier informed Dowd that the balance of his funds were proceeds from illegal activities and located in the Bahamas. Dowd advised petitioner to have the money wired from the Bank of the Bahamas. In response, the petitioner told Dowd that the only way to obtain the large sum of money Dowd demanded was to smuggle it illegally into the United States. Dowd instructed petitioner to send someone to the Bahamas to retrieve the money for delivery to Dowd. Within a month of Dowd's joining the new firm, petitioner had deposited $100,000 into the firm's account using $5,000 cashier's checks purchased in fictitious names.

Acting on Dowd's direction and with Dowd's full knowledge, petitioner made arrangements for his brother-in-law to smuggle large sums of cash into the United States from the Bahamas. Traveling under an alias, the brother-in-law made several trips and illegally smuggled cash into the United States in $25,000 amounts. On one occasion, he smuggled in $50,000 in cash. These sums were used to make payments to Dowd's new law firm. Even so, Dowd's demands for fee payments continued. In July 1984, petitioner's brother-in-law was arrested in Miami carrying $100,000 in cash earmarked for fee payments to Dowd. Dowd was aware of this incident and aware also that the $100,000 was intended to defray his fee demands.

By this time, after June 1984, petitioner had paid Dowd about $250,000. Despite this, and despite the brother-in-law's arrest, Dowd continued to press for more fee payments. At the same time, the grand jury had increased its activity, serving subpoenas on Dowd's former law firm for its records reflecting petitioner's fee payments. This caused petitioner to question Dowd concerning whether petitioner should continue to transport funds from the Bahamas to Dowd's firm using cashier's checks purchased in false names. Dowd counseled petitioner to continue using the cashier's checks.

In response to Dowd's continuing demands for fee payments, petitioner himself traveled twice to the Bahamas to smuggle more money into the United States for fee payments. Dowd knew of these trips and their purpose. On the first trip, petitioner brought back $150,000. He again expressed concern over the use of cashier's checks given the grand jury's success in obtaining Whitman and Ransom's records. Accordingly, Dowd instructed petitioner to make smaller direct cash deposits to his firm's account to avoid the requirement to fill out Transaction Report Forms. Dowd gave petitioner deposit slips for this purpose and petitioner then followed this procedure. When the bank nonetheless insisted on the forms, Dowd instructed petitioner to revert to the old procedure of making

payments in $5,000 cashier's checks purchased using various names and made payable to the law firm. In accordance with these instructions, approximately $80,000 in cashiers checks were paid to Dowd's firm.

On January 15, 1985, petitioner was named in 24 counts of a 48 count indictment.[5] Included among the charges was the principal charge of conspiracy to possess and distribute marijuana. Among the overt acts listed in furtherance of the conspiracy was the August 1984 incident involving the brother-in-law's attempt to smuggle $100,000 in cash from the Bahamas into the United States. Dowd knew, of course, that the smuggled currency was drug trafficking profits intended for payment of legal fees. This arguably gave Dowd a personal stake in the disposition of the case and presented him with a possible conflict of interest. Nonetheless, Dowd said nothing to petitioner concerning the possible conflict of interest and continued his representation.

Following the indictment, petitioner was arrested and incarcerated. Dowd advised petitioner that he would not be able to continue his representation because a court order had been entered prohibiting Dowd from accepting any more money from petitioner. Just two days later, Dowd returned and told petitioner he had devised a way to circumvent the court's order by making direct deposits into the firm's general account rather than into the firm's trust account designated for petitioner. Accordingly, Dowd advised petitioner to have his brother-in-law deliver the $5,000 cashier's checks to Dowd personally. Approximately $40,000 was paid in this manner. Thereafter, when it became apparent petitioner would pay no more fees, Dowd again threatened to withdraw from the case.

In the course of the grand jury investigation, Dowd and the petitioner discovered that a prosecutor and two agents had violated a court order by reviewing documents previously held covered by the attorney-client and Fifth Amendment privileges. As a result of this incident, the District Court disqualified the prosecutor and the agents from participating further in the investigation of the petitioner and his wife. The District Court denied government's motion for a stay of this order, but the Court of Appeals granted a temporary stay. Accordingly, the prosecutor and agents continued to participate in the grand jury investigation. Less than a week later, on January 9, 1985, the grand jury returned its indictment signed by the prosecutor.

In any event, based on this incident, Dowd filed a motion to dismiss the indictment against petitioner and his wife. Prior to a hearing on the motion, Dowd resumed exerting pressure on petitioner to pay more fees. Dowd insisted that another $200,000 would be needed if petitioner wished the case to be tried. By this time, petitioner had already paid approximately $500,000 in fees. Even so, Dowd advised petitioner that he was still in debt to Dowd for $40,000 in fees already due and unpaid and that a trial would cost $200,000 in additional fees.

The motion to dismiss was denied on March 1, 1985. The plea hearing was held on the same date. Dowd never informed petitioner of any right of appeal concerning the ruling on the dismissal motion, nor did he discuss with petitioner the merits of such an appeal. Instead, at this point, Dowd began discussing with petitioner the advisability of pleading guilty. Petitioner informed Dowd he would agree to plead guilty only if assured that he would receive no more than the mandatory minimum 10 year prison sentence on the CCE charge[6] and that his wife would only receive probation. Thereafter, Dowd reported to petitioner that he had succeeded in negotiating a plea agreement with the government that would place a 20 year cap on sentencing, require forfeiture of all of petitioner's assets, and his full cooperation, as well. Apparently Dowd also led petitioner to believe that he would receive the minimum 10 year

---

5. At this time, the government also secured a restraining order freezing petitioner's assets.

6. As noted, this charge carried a maximum term of life imprisonment.

CCE sentence if he cooperated fully with the government. Petitioner felt he had little choice and accepted the plea agreement, which he signed on March 18, 1985.

Following the plea, the petitioner was extensively debriefed. The government was dissatisfied with the results of the debriefing, believing petitioner was not making the full disclosure required by the plea agreement. Specifically, the government believed he was concealing assets. As a result, petitioner feared the government would "back out" of its verbal agreement to recommend the minimum CCE sentence and probation for his wife. Petition, at ¶ 28. Accordingly, petitioner insisted that Dowd obtain assurance from the government that it would recommend the minimum 10 year sentence and support his wife with a $2,000 per month stipend. Dowd reported to petitioner that the government had agreed to this provided petitioner passed a polygraph test on his assets. Petitioner agreed to undergo the polygraph test. He failed two such tests. On one of these occasions, Dowd in the presence of agents, told petitioner to stop holding back and reveal where the assets were hidden. Outside the presence of agents, Dowd threatened petitioner with the prospect of a lengthy sentence and hence permanent separation from his wife and children if he did not tell agents where assets were hidden. Prior to this time, petitioner had told the government that he had paid Dowd over one-half million dollars in fees, but declined to talk about these payments on the instruction of his counsel (Dowd's associate), who claimed the attorney-client privilege. Dowd also instructed petitioner not to reveal anything about the payments because it was privileged information. Following the failure of the second polygraph test, Dowd joined with government agents in chastising petitioner for his untruthfulness. Dowd told the petitioner to expect to be sentenced to the maximum cap of 20 years. In fact, petitioner received a 17 year sentence.

Shortly after his sentencing, petitioner wrote the prosecutor requesting an opportunity to discuss with her matters concerning Dowd's representation of petitioner. He was accorded this opportunity and ultimately disclosed to her the substance of the allegations in the petition. With the prosecutor's assistance, petitioner dismissed Dowd and retained new counsel for the Rule 35 hearing. Thereafter, government investigation of Dowd began, including two grand juries and a review by the Department of Justice.[7]

### Analysis

#### A. Overview

The line of decisions stretching from *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) makes indisputably clear that felony criminal defendants are constitutionally entitled to the undivided loyalty of competent counsel.[8] Counsel whose interests diverge from that of the defendant-client cannot render competent legal services or give the client undivided loyalty. Courts hold, therefore, that where such an actual conflict of interest exists, prejudice is presumed. *See Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). But this presumption is limited to those circumstances where "the defendant demon-

---

**7.** Petitioner's allegations against Dowd led to two grand jury investigations and a review of Dowd's actions by the Department of Justice. Neither grand jury indicted Dowd. Following its review, the Department of Justice chose not to take any action against Dowd. Instead, the department referred these allegations to the District of Columbia Bar Association for further investigation. The status or results of this investigation are unknown to the Court.

**8.** Other landmarks in the developing protection of the rights of criminal defendants in this respect include *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Adams v. United States ex rel McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

strates that [the] ... 'conflict of interest adversely affected his lawyer's performance.' " *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067 [quoting *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719] (footnote omitted).[9] Put another way, the rule is that once a defendant "has prove[n] the existence of an actual conflict, only an adverse impact on the attorney's performance must be shown." *Ruffin v. Kemp,* 767 F.2d 748, 752 (11th Cir.1985); *see also United States v. Lorizzo,* 786 F.2d 52, 58 (2d Cir.1986). But even if a conflict occurs, a defendant may waive the right to conflict-free representation. Such waiver, to be effective, must be "voluntarily, knowingly, and intelligently done with sufficient awareness of the relevant circumstances and likely consequences." *Bridges v. United States,* 794 F.2d 1189, 1193 (7th Cir.1986). Simply put, waiver is effective if the defendant "knows what he is doing and his choice is made with eyes open." *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) [quoting *Adams v. United States,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942) ]; *see also United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 437 (7th Cir.1983). In sum, petitioner is entitled to relief only if he demonstrates that his interest was in actual conflict with Dowd's, that this conflict had an adverse effect on Dowd's representation, and that he did not knowingly waive his right to conflict-free representation.

### B. *Actual Conflict*

■ An actual conflict of interest occurs in circumstances where a lawyer's interests are such that it is reasonable to believe that she or he would be tempted to act in a manner inimical to the client's best interests. Such a conflict plainly arises where a lawyer becomes entangled in the conduct charged against the client. In those cir-

cumstances, it is reasonable to believe that the lawyer would be tempted to sacrifice the client to save himself or herself.

In the Third Circuit's words, "when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces [himself] potential liability for those charges, he has an actual conflict of interest." *Government of the Virgin Islands v. Zepp,* 748 F.2d 125, 135 (3d Cir.1984). Precisely this occurred here. By advising and encouraging petitioner to smuggle drug trafficking profits into this country for the purpose of making fee payments, Dowd entangled himself in the charged conduct. He acquired independent personal knowledge of facts concerning an aspect of the charged conduct, namely the 1984 currency smuggling episode by petitioner's brother-in-law. Indeed, because he advised and encouraged this conduct, he not only had knowledge of it, he also "face[d] potential liability for those charged [and thus] he [had] an actual conflict of interest." *Id.* Nor is it difficult to envision how this conflict might malignantly manifest itself. Consider, for example, the situation Dowd would face were he required to examine or cross-examine petitioner's brother-in-law. Arguably, it would enure to petitioner's benefit to present testimony to establish that the currency smuggling incident had nothing to do with the charged conspiracy. Yet, surely Dowd would fervently wish to avoid this area, since examination of petitioner's brother-in-law might well reveal Dowd's involvement in the currency smuggling, thereby exposing him to potential criminal liability. In this instance, therefore, it is reasonable to conclude that Dowd would choose a course of action to suit his own interests in avoiding criminal liability over a course of action most favorable to his client.[10] As the Sec-

---

**9.** The Fourth Circuit anticipated this rule when it held, in *United States v. Young,* 644 F.2d 1008, 1013–14 (4th Cir.1981), that the "critical question [is] whether an actual conflict of interest adversely affected the fairness" of the trial. *See also, United States v. Taylor,* 657 F.2d 92 (6th Cir.1981).

**10.** Yet another manifestation of the actual conflict can be seen in the plea negotiations con-

text. Petitioner, if represented by new independent counsel, might well have been able to negotiate a lesser sentence in return for agreeing to testify against Dowd. Although Dowd and his associate advised petitioner to invoke the attorney-client privilege on this subject, petitioner could have waived the privilege and implicated Dowd. Indeed, new and independent counsel

ond Circuit recognized, "[w]hat could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities." *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1983); *see also Mannhalt v. Reed*, 847 F.2d 576, 581 (9th Cir.1988) (actual conflict existed where attorney was accused of purchasing stolen property from defendant); *United States v. McLain*, 823 F.2d 1457 (11th Cir.1987) (defendant entitled to new trial because his counsel, unbeknownst to defendant, had been under investigation for bribery); *cf. In re Investigation Before Feb. 1977, Lynchburg Grand Jury*, 563 F.2d 652 (4th Cir.1977) (attorney who is target of grand jury investigation may not represent witnesses before the grand jury); *Government of the Virgin Islands v. Zepp*, 748 F.2d 125, 135 (3d Cir.1984).

It is simply not persuasive to argue, as the government does here, that no real conflict existed because petitioner and Dowd had the same ultimate goal, namely, petitioner's acquittal. Actual events torpedo this argument; it is too simplistic; it ignores that there are other possible outcomes that may serve Dowd's interests, but not petitioner's. To be sure, Dowd's interests would be well served by petitioner's acquittal on all charges. But Dowd's interests would be equally well served by petitioner pleading guilty to some charges, thereby cutting off further inquiry into facts that might expose Dowd to criminal liability. Indeed, petitioner would argue that this is precisely what occurred. In sum, petitioner's allegations amply demonstrate an actual conflict.[11]

might well have recommended this course of action.

**11.** At this point, it is well to be reminded that this matter is before the Court on a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. Thus, the "facts" used in argument here are simply petitioner's allegations assumed to be true only for purposes of this motion. In actuality, the facts are hotly disputed. The government, it appears, denies most, if not all, of petitioner's allegations. It may be assumed that Dowd also denies them as they allege serious criminal and professional misconduct on his part. Were this motion to fail, a hearing would be required to resolve the factual disputes and

### C. *Adverse Impact on Performance*

Although petitioner need not show actual prejudice flowing from the conflict, he must show that Dowd's performance was adversely affected. *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. An "adverse impact" may be shown by counsel's failure to pursue a vigorous defense or plea posture. *United States v. McLain*, 823 F.2d 1457 (11th Cir.1987); *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984). More to the point, adverse impact resulting from a conflict is shown here by counsel's efforts to pressure or coerce the client to accept a plea to protect the interests of others, including counsel. *See Thomas v. Foltz*, 818 F.2d 476, 482–83 (6th Cir.1987) (counsel's pressure on defendant to plead guilty to protect others had adverse impact on defendant's plea decision). Again, this is precisely what petitioner alleges occurred here. Petitioner's allegations, if true, establish that Dowd encouraged, if not coerced, petitioner to engage in illegal conduct and then exerted pressure on petitioner to plead guilty to protect his own interest. Absent a guilty plea, it is likely that a full blown trial would have uncovered the facts implicating Dowd in criminal conduct. There is little doubt that these circumstances, if true, amply satisfy the adverse impact requirement.

Persuasive authority supports this conclusion. *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984) is illustrative. There, Cancilla appealed a conviction for insurance fraud. The government, on appeal, invited the Court to assume that during the representation Cancilla's trial coun-

determine whether an actual conflict existed. *See Briguglio v. United States*, 675 F.2d 81 (3d Cir.1982) (*per curiam*) (evidentiary hearing on conflict required where defense counsel is under investigation by U.S. Attorney); *United States v. Hearst*, 638 F.2d 1190 (9th Cir.1980) (evidentiary hearing required to investigate whether defense counsel's book contract on the case gave rise to an actual conflict). As it happens, however, no hearing is required here because even assuming an actual conflict and an adverse impact on Dowd's performance, the Court concludes petitioner is not entitled to relief because he waived his rights.

sel was engaged in the same type of criminal conduct with a co-conspirator of Cancilla's for which Cancilla was convicted. The government further invited the court to assume that Cancilla was not aware of the criminal conduct—thereby eliminating any possibility that Cancilla waived his defense. On these assumed facts, the Second Circuit held that defense counsel's similar criminal conduct adversely affected his representation of Cancilla:

> With the similarity of counsel's criminal activities to Cancilla's schemes and the link between them, it must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes.... It is noteworthy that Cancilla, on advice of counsel, chose not to present a defense. Moreover, representation of Cancilla in ways other than by a vigorous defense may have been affected. It is difficult to see how counsel conflicted in this way could impartially have given Cancilla advice on whether or not to take a guilty plea, since counsel might have feared that acceptance of a plea would turn on Cancilla's cooperation, which might lead to discovery of the link to counsel's own activities.

*Id.* at 870.[12] Similarly, it is difficult to see how counsel in the case at bar, given the conflict, could provide petitioner with impartial advice on the merits of a guilty plea versus a trial.

*Mannhalt v. Reed,* 847 F.2d 576 (9th Cir.1988) also demonstrates that petitioner's allegations, if true, establish an adverse affect on Dowd's performance. Defendant Mannhalt was represented at trial by Kempton. During the course of discovery, Kempton learned that a key government witness, Morris, would testify that Kempton purchased stolen goods from Mannhalt. Further, Kempton discovered that he was under investigation by the authorities. Morris did present this testimony against Kempton at Mannhalt's trial. After his conviction, Mannhalt filed a *habeas* petition claiming ineffective assistance of counsel. The district court rejected Mannhalt's claim. The Ninth Circuit panel reversed, finding that Morris's accusation against Kempton adversely affected Mannhalt's representation. Among the reasons given by the *Mannhalt* court was the probability that given Kempton's status as the target of an investigation, he would not pursue a plea bargain in which Mannhalt would agree to testify against Kempton. *Id.* at 582–83:

> Although it is impossible to speculate what the prosecution would have done if Mannhalt had not retained Kempton, it is clear that Kempton did not pursue a plea bargain that might have involved revealing incriminating information about himself. Therefore, a conflict adversely affected Kempton's performance.

*Id.* at 583. The same result obtained in *United States v. McLain,* 823 F.2d 1457 (11th Cir.1987). There, the Eleventh Circuit determined that trial counsel's status as the target of an investigation by the United States Attorney's office adversely affected his representation during plea negotiations. Although Dowd was not an investigation target during the pertinent period, the *McLain* and *Mannhalt* rationales apply here with persuasive force. Dowd surely knew that a guilty plea was more likely to enable him to keep his criminal conduct concealed than would a full trial. Under these circumstances, there can be little doubt that petitioner has made the requisite showing of adverse impact.

In arguing the contrary, the government relies on *LoConte v. Dugger,* 847 F.2d 745, 754 (11th Cir.1988); *United States v. Horton,* 845 F.2d 1414, 1420–21 (7th Cir.1988); and *United States v. Shaughnessy,* 782 F.2d 118, 120 (8th Cir.1986). All are inapposite. *Horton,* in particular, bears little resemblance to the case at bar. There, it

---

12. The *Cancilla* holding rested in some part on the rule adopted by the Second Circuit in *Solina v. United States,* 709 F.2d 160 (2d Cir.1983). The *Solina* rule holds that when the attorney is accused not simply of incompetence, but illegal activity, then there is a per se showing of prejudicial affect. However, the *Cancilla* opinion does not rely solely on the per se rule. Under the facts presented in *Cancilla,* an adverse affect was also demonstrated. *Cancilla,* 725 F.2d at 871.

was argued that because trial counsel was a candidate for the position of United States Attorney, he sought to curry favor with the President by failing to pursue a vigorous defense. The Seventh Circuit flatly rejected this claim. It concluded that a remand for a hearing was unnecessary, that there was no evidence of adverse impact, and that candidates for the post of United States Attorney could represent criminal defendants without, as a matter of law, having a conflict of interest. *Id.* at 1419–21. *Horton* is too far afield from the instant case to be instructive.

*LoConte* and *Shaughnessy* are also inapposite. Both found no adverse impact only after a full evidentiary hearing and on facts dissimilar to those alleged at bar. In *Shaughnessy*, the defendant alleged only that his counsel's retention by a co-defendant established an adverse impact. An evidentiary hearing apparently showed otherwise. In any event, there was no allegation there that counsel engaged in criminal conduct. The same is true of *LoConte*. There, too, defendant alleged only that trial counsel's performance was adversely affected by his representation of co-defendants. No persuasive authority has been cited that casts doubt on the Court's conclusion that, assuming the truth of petitioner's allegations, the actual conflict in this case had an adverse impact on Dowd's representation of petitioner.

### D. *Waiver*

■ Waivers of constitutional rights must be "knowingly, voluntarily, and intelligently" made and they must not be lightly inferred. *Bridges v. United States,* 794 F.2d 1189, 1193 (7th Cir.1986); *see also Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Here undisputed record facts convincingly establish that petitioner waived his right to conflict-free counsel. By petitioner's own admission, Dowd, over a two-year period, continuously pressured petitioner to pay exor-

bitant fees and to do so by illegal means using funds derived from illegal activities, namely drug trafficking profits. Nor is there any doubt that petitioner fully knew and appreciated the criminal nature of the currency smuggling and the various fee payment schemes. A vivid illustration of petitioner's awareness is his concern, expressed to Dowd, that the grand jury might discover the fee payments made by using cashier's checks in fictitious names. It was on one of these occasions that Dowd instructed petitioner to make smaller direct cash deposits to Dowd's firm's account to avoid the requirement to fill out bank forms. Petitioner's desire to conceal the payments and their source reflects his appreciation of the illicit nature of the conduct. This is in sharp contrast to those cases granting relief on the ground that counsel's illegal conduct was unknown to the client. *See United States v. McLain,* 823 F.2d 1457 (11th Cir.1987); *Briguglio v. United States,* 675 F.2d 81 (3d Cir.1982) (*per curiam*); *United States v. Taylor,* 657 F.2d 92 (6th Cir.1981). Here, petitioner had full knowledge. Even so, and notwithstanding persistent and mounting demands for greater and greater fees, petitioner chose to keep Dowd as his counsel. To contend, as petitioner does, that he had no choice is arrant nonsense. Petitioner knew how to hire Dowd so "we may assume that he also knew how to fire [him]." *United States ex rel Tonaldi v. Elrod,* 716 F.2d 431, 439 (7th Cir.1983). Indeed, it appears that on at least one occasion petitioner considered carefully whether to continue with Dowd. Thus, in testimony before a grand jury investigating Dowd's conduct, petitioner admitted that he consulted with his family attorney concerning Dowd's competence, reputation and the reasonableness of the fee demand. The attorney advised petitioner to consider hiring another attorney. Petitioner, however, elected to continue with Dowd.[13] And even on the

---

**13.** The grand jury record is appropriately before the Court on this motion since petitioner made it a part of, and attached it to, his Petition. The telling testimony is set forth here:

And then after I had spilled my guts to John Dowd and told him the amount of money that I'd made, my complete involvement in everything, he had, and after him talking to Tom Greene concerning what Tom Greene had

eve of trial, when Dowd refused to continue the representation because he could not receive more fees, petitioner did not retain new counsel or ask for appointed counsel. Instead, when Dowd returned two days later with a new scheme designed to circumvent the court order preventing funds transfers, petitioner agreed to continue the representation. At the time, then, petitioner must have meant what he said when, in response to the plea judge's inquiry on whether he was satisfied with Dowd's representation, he said, "[v]ery much so, your honor." Transcript of Plea Hearing, March 13, 1985 at 9. The inescapable conclusion is that petitioner "knew what he was doing, voluntarily made his own choice, and misled the trial court in the process." *Bridges v. United States*, 794 F.2d 1189, 1194 (7th Cir.1986).

*Bridges* is strikingly similar to the case at bar. Defendant pled guilty to cocaine distribution charges. In a subsequent Section 2255 proceeding, defendant alleged that his counsel's performance had been adversely affected. Specifically Bridges stated that he first retained his counsel, "J.C.," in 1979 when he was arrested on a murder charge. At that time, Bridges began supplying J.C. with cocaine. In return, J.C. had referred a cocaine customer to Bridges. Moreover, J.C. took $50,000 to "fix" the murder charge, one-half of which was to go to the judge. Bridges raised this money through drug transactions. Ultimately, Bridges was acquitted of the murder charge following a bench trial. *Id.* at 1191. Thereafter, Bridges' continuing drug trafficking activities gave rise to a variety of drug charges which were usually based on arrests by a police sergeant ("P.C."). J.C. assured Bridges that he need not go to jail because Sergeant P.C. was "under control" and that P.C.'s warrants would always have a "saving deficiency." *Id.* But Bridges soon discovered a problem with these arrests:

J.C. colluded with Sergeant P.C. to "set him up," by arranging for his arrest when it was known where he would be when in possession of drugs. J.C. would then exact a substantial fee for Bridge's defense. By 1980 Bridges claims he had discovered the setup and had discontinued letting J.C. know where he was. Nevertheless, Bridges continued to retain J.C. as his attorney in a series of

charged Barry Toombs, he, I felt he was trying to rip me off or charge me too much.

I discussed it with my father. My father asked me or suggested to me that I contact a family attorney that has been close to our family for 30 or more years.

Q And what's his name?

A Tom Monahan.

(Off the record.)

A Yes, my father suggested that I talk to our family attorney, Tom Monahan, which I did.

Q And then, did you meet with Mr. Monahan?

A Yes, I met with him at his office in, I believe, I went out to Winchester.

Q What did you say during that meeting?

A I told him that I was under, let me back up, told him that there was a Grand Jury sitting, investigating me and my marijuana activities and that I had talked to a lawyer by the name of John Dowd. I explained to him who had suggested that I go see Dowd.

I explained to him that I had told John Dowd about all my involvement, even though I didn't discuss my involvement with Monahan. I told him that I was free and candid with John Dowd.

I told him that the first day that he told me that 100,000 would be, that he could handle my case for 100,000. I told him that after two weeks of discussing the, my involvement with the business and the amount of money that I had made, that he had reassessed his fee and was now wanting 500,000 up front.

Q What was Mr. Monahan's advice to you?

A He told me for money like that I could hire Edward Bennett Williams and that I should consider someone else; or, if I was gonna stay with Dowd that I should consider a pay-as-you-go basis and just get a monthly invoice for services rendered.

And that I asked him if he would check into John Dowd and see if he was competent and reputable. And see if, and that I would contact him, or if he would contact me back after he did this.

Q All right. And did Mr. Monahan do that?

A Yes, he did.

Q And did he report to you that Mr. Dowd was, in fact, reputable and competent?

A He did.

Q All right. And did you decide to stay with Mr. Dowd?

A I did.

Grand Jury Transcript, September 24, 1985 at 13–15.

theft and drug charges likely resulting from Sergeant P.C.'s continuing arrest of Bridges.

*Id.* Thereafter, Bridges became a partner with Sergeant P.C. in the same business: setting people up for drug arrests, and then splitting the fees obtained from their release. Because they were partners, Sergeant P.C. promised to vouch for Bridges in the event of his arrest. When Bridges was arrested on the federal drug charges, however, Sergeant P.C. was called as a prosecution witness. J.C., according to Bridges, told him that the government's case was weak. Further, J.C. told Bridges that he would "go against" Sergeant P.C.'s testimony. But, J.C. also advised Bridges that if he plead guilty he would be sentenced to no more than five years imprisonment with five years probation. Bridges acquiesced. To his surprise, he was sentenced to twelve years imprisonment, later reduced to nine, and a lifetime special parole term. According to Bridges, these facts established an actual conflict of interest. This conflict was described in terms that squarely fits the instant case.

> Bridges contends that a conflict existed which disabled his defense since it was in J.C.'s own best interest for Bridges to enter a guilty plea and bring the case to a close before J.C. would run the danger of exposing his own activities in a trial or plea bargain. According to Bridges, J.C. therefore induced him with false assurances to plead guilty.

*Id.* at 1192.

The Seventh Circuit rejected this argument. Instead, it found that Bridges waived his right to conflict free representation. As that court put it:

> Bridges, as was laid out in detail in his own pleadings, had all the information [of J.C.'s malfeasance] long before entering his guilty plea. Bridges chose to trust J.C. with his defense in spite of J.C.'s known untrustworthiness. The waiver of constitutional rights, in general, may be effective even without specific knowledge of all the implications. Bridges, however, was experienced enough in criminal proceedings to have

an understanding of even the implications. The particular words that ordinarily surround waiver in open court are not in the record here, but circumstantially and directly the necessary elements of a valid waiver are present in Bridges' own words. The law is not so blind, foolish or naive to permit this attack by Bridges on his guilty plea in the facade of a constitutional right.

*Id.* at 1194.

*Bridges* is squarely in point. Petitioner, like Bridges, was a mature adult with a high school diploma and had considerable criminal experience. Also, petitioner, like Bridges, knew that his counsel was involved in illegal activity, knew that his attorney was untrustworthy, but chose in any event not to discharge counsel. In so doing, both Bridges and petitioner plainly waived their right to a conflict free counsel. To fail to find waiver in the circumstances at bar or in *Bridges* is tantamount to arming defendant's with "an insurance policy against an unfavorable verdict." *United States v. Breit*, 712 F.2d 81, 83 (4th Cir.1983) (Defendant, an attorney, who knew that certain jurors had lied in voir dire and chose to remain silent until after verdict, waived his right to mistrial). He would, in effect, give defendant's "two bites at the apple, with a most unfair reduction, because of the passage of time, ... in the probability that the [government] could present its case as strongly as would have been possible." *Gray v. Hutto*, 648 F.2d 210, 212 (4th Cir.1981). In *Gray*, defense counsel had knowledge of juror misconduct prior to the jury verdict. But rather than requesting a mistrial immediately, he waited until after the jury convicted his client before bringing this misconduct to the attention of the trial judge. The Fourth Circuit found these facts "essentially amount to a waiver and foreclose reliance by [the defendant] on the claimed impropriety of the juror." *Id.* at 211. Here, too, the facts essentially amount to waiver and foreclose petitioner's reliance on Dowd's alleged improprieties. Petitioner knew of conduct creating the conflict and yet chose to remain silent and retain Dowd as counsel.

In sum, petitioner cannot " 'try to take advantage of the criminal justices system by ... salting away and saving ... something he thinks will vacate and render null and void a long, tortuous criminal justice procedure that is undertaken in good faith by other parties.' " *Bridges*, 794 F.2d at 1195 [quoting the *Bridges* district court decision]. Petitioner should have come forward with his allegations against his counsel immediately—failure to do so is fatal to his claim.

For the reasons stated herein, the Court concludes that petitioner's conduct amounts to a waiver and his petition must therefore fail. An appropriate order will issue.