Guenter **MANNHALT,**
**Petitioner–Appellant,**

v.

Amos E. **REED, Respondent–Appellee.**

No. 87–4093.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1988.

Decided May 25, 1988.

Richard Hansen, Allen & Hansen, Seattle, Wash., for petitioner-appellant.

Charles J. Faddis, Asst. Atty. Gen., Dept. of Corrections, Olympia, Wash., for respondent-appellee.

Before BEEZER, HALL and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Guenter Mannhalt, a Washington state prisoner, appeals the district court's denial of his petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254. Mannhalt alleges that he was denied effective assistance of counsel because of his attorney's conflict of interest and that a jury instruction deprived him of due process. We REVERSE.

## I.

### FACTS AND PROCEEDINGS BELOW

In December, 1980, Guenter Mannhalt was charged in King County, Washington, with one count of conspiracy to commit robbery, one count of attempted robbery, and several counts of robbery and possession of stolen property. In all the robbery counts, the state alleged that Mannhalt was an accomplice by virtue of soliciting others to commit the crimes. The possession of stolen property counts were based on jewelry seized from a safe in Mannhalt's donut shop.

Mannhalt was represented at trial by James Kempton, a Seattle attorney. Kempton had known Mannhalt for several years and had previously represented him in a related trial in Whatcom County, Washington. Sometime in 1979 or 1980 Kempton purchased a gold watch from Mannhalt. Mannhalt assured Kempton that the watch had been purchased from a friend.

The charges against Mannhalt followed the arrest in October, 1980, of Tommy Morris in connection with several robberies. Morris agreed to testify against several individuals, including Mannhalt, as part of a plea bargain. Before this deal was negotiated, Kempton appeared with Morris at his arraignment. Kempton's associate, Deborah Youngblood, later represented Morris at a line-up. Both attorneys claim that they never discussed any aspect of the case with Morris. Kempton never formally agreed to represent Morris and never opened a file.

According to a police report dated November 9, 1980, Morris agreed to give information about twelve items. Item No. 11 read:

11. Attorney James Kempton purchased a stolen ring $1200 with $100 bills; taken from Lake Washington area. Also purchased a stolen bracelet.

Kempton became aware of this accusation while preparing for Mannhalt's trial. Kempton discussed the accusation with Mannhalt, but did not point out a potential conflict of interest.

At trial, Kempton conducted an extensive cross-examination of Morris, who testified on behalf of the prosecution. Kempton brought out that Morris had received a favorable plea bargain for agreeing to testify. Kempton then confronted Morris with his accusation that Kempton had purchased stolen property. Kempton became increasingly agitated during the cross-examination. Kempton offered his own unsworn testimony that Morris' accusation was false: "No, he's telling the police I'm buying stolen goods. I'm proving he's a liar." At one point Kempton asked his wife, a spectator, about her jewelry and she came forward and commented that she was wearing rings and that she hoped they were not glass. Kempton asked Morris many times whether he would lie and Morris replied: "Would you?" and "I've got up here and told the truth to the best of my knowledge." Kempton also asked Morris about the "diamonds from the market place" in evidence against Mannhalt. Morris admitted he had been in the donut shop where the jewelry had been seized and where Kempton had allegedly purchased stolen jewelry. Morris then volunteered that he had seen Kempton at the donut shop.

Kempton admitted that he lost his composure during the cross-examination. In his affidavit submitted in these habeas corpus proceedings, Kempton stated: "I was visibly shaken and I was furious. The court cannot appreciate the furor one feels when being confronted by an absolute thieving liar and saying that one is the purchaser of stolen items." Also, during the cross-examination the trial judge re-

marked: "Things are coming a little unglued here, a little bit out of order."

Kempton did not take the stand to refute Morris' accusation. Neither did Kempton question Mannhalt about whether Kempton had ever purchased stolen jewelry.

Mannhalt was convicted on the conspiracy charge, seven robbery charges, and three possession of stolen property charges. (Counts I–VII, XIII–XV). He was acquitted on four robbery charges and one stolen property charge (Counts IX–XIII, XVI). On September 18, 1981, Mannhalt was sentenced to concurrent life terms on six first degree robbery counts and lesser concurrent terms on the remaining counts.

Mannhalt has exhausted his state remedies as required by 28 U.S.C. § 2254. In denying Mannhalt's petition for discretionary review, the Washington Supreme Court found no actual conflict of interest presented. Mannhalt then filed a habeas corpus petition in federal court. The parties submitted depositions of the state court prosecutors, and affidavits of the defense attorneys and Mannhalt. Both parties moved for summary judgment. On February 10, 1987, the United States Magistrate issued a report and recommendation finding that Mannhalt's ineffective assistance claim had merit. The district court judge rejected the recommendation and granted the state's summary judgment motion. The Magistrate submitted a supplemental report and recommendation on the unconstitutional jury instruction issue, finding the claim meritless. The district court adopted the recommendation and entered judgment on July 20, 1987.

Mannhalt raises two claims on appeal. First, he argues that he was denied effective assistance of counsel because his attorney had previously represented a key government witness and because his attorney was accused of criminal conduct related to that for which Mannhalt was being tried. Second, Mannhalt urges that the trial court's jury instruction on accomplice liability violated due process by relieving the state of its burden of proving every element of a crime beyond a reasonable doubt.

## II.

### STANDARD OF REVIEW

This court reviews de novo the decision to grant or deny a petition for habeas corpus. *Weygandt v. Ducharme*, 774 F.2d 1491, 1492 (9th Cir.1985). The question of whether an attorney renders ineffective assistance is a mixed question of law and fact, reviewed de novo. *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir.1985).

## III.

### ANALYSIS

■ To prevail on his claim for habeas relief, Mannhalt must show that his detention violates the Constitution, a federal statute, or a treaty. *See Rose v. Hodges*, 423 U.S. 19, 21, 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975) (per curiam); 28 U.S.C. § 2241(c)(3). Mannhalt alleges that he was deprived of his sixth amendment right to effective assistance of counsel because his attorney had two conflicts of interest. First, Kempton had previously represented a key government witness, and second, Kempton had been accused of criminal conduct related to that for which Mannhalt was being tried.

■ The sixth amendment guarantee of effective assistance of counsel comprises two correlative rights: the right to counsel of reasonable competence, *McMann v. Richardson*, 397 U.S. 759, 770–71, 90 S.Ct. 1441, 1448–49, 25 L.Ed.2d 763 (1970), and the right to counsel's undivided loyalty, *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1103–04, 67 L.Ed.2d 220 (1981). The Supreme Court has articulated the different standards by which to judge the violation of these rights. To establish a sixth amendment violation based on a conflict of interest the defendant must show 1) that counsel actively represented conflicting interests, and 2) that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350, 100 S.Ct. 1708, 1719, 64

L.Ed.2d 333 (1980). Unlike a challenge to counsel's competency, prejudice is presumed if the defendant makes such a showing. *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). Although *Cuyler* involved a conflict of interest between clients, the presumption of prejudice extends to a conflict between a client and his lawyer's personal interest. *See United States v. Hoffman,* 733 F.2d 596, 601–02 (9th Cir.) (client alleged conflict because of attorney's failure to notify federal judge of state bar suspension), *cert. denied,* 469 U.S. 1039, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984); *United States v. Hearst,* 638 F.2d 1190, 1193 (9th Cir. 1980) (conflict based on attorney's private financial interests), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

### A. *Prior Representation of Government Witness*

Mannhalt argues that a conflict existed between Kempton and himself because Kempton had represented Morris in a prior unrelated criminal case and briefly at Morris' arraignment and line-up in this case. An exchange at trial revealed this prior representation and, according to Mannhalt, suggested that Morris would have gone to trial even though guilty if he could have afforded to hire Kempton. Mannhalt argues, therefore, that he was impliedly guilty by association with his defense counsel.

■ Conflicts of interest can arise both in cases of simultaneous and successive representation. Generally, it is more difficult to show an actual conflict resulting from successive rather than simultaneous representation. *Smith v. White,* 815 F.2d 1401, 1405 (11th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Although Kempton and Youngblood appeared at Morris' arraignment and line-up, this is not a case of simultaneous representation. Neither attorney entered into an attorney-client relationship with Morris. They did not discuss the case with Morris or open a file and no further action

was taken on Morris' behalf after the line-up.

At most, then, this is a case of successive representation. Kempton does not recall ever representing Morris, but even assuming he did, Mannhalt has failed to show how this prior representation created an actual conflict with Kempton's representation of Mannhalt in this case. In successive representation, conflicts of interests may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalities. *United States v. Wheat,* 813 F.2d 1399, 1402 & n. 1 (9th Cir.), *cert. granted on other grounds,* — U.S. ——, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987); *Trone v. Smith,* 621 F.2d 994, 998–99 (9th Cir.1980). Here, the prior representation was completely unrelated and Mannhalt has not shown that any privileged information was either divulged *or* withheld. Thus, no actual conflict existed.

Instead, Mannhalt claims that Kempton's prior representation of Morris somehow implied Mannhalt's guilt. This contention is entirely speculative. Although the admittedly guilty Morris may have gone to trial if he could have paid Kempton, this implies *nothing* about Mannhalt's guilt or innocence.

### B. *Morris' accusation of criminal conduct by Kempton*

Mannhalt also alleges a conflict of interest between himself and Kempton because Morris had accused Kempton of buying stolen property from Mannhalt.

■ Mannhalt cannot prevail on this claim if he has waived it by consenting to Kempton's representation. Although Mannhalt was aware before trial of Morris' accusation against Kempton, he has not waived his right to conflict-free representation. The waiver of the right to counsel must be knowing and intelligent. Whether there is a proper waiver should be determined by the trial court and any such waiver should appear on the record. *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Here, Kempton discussed the accusation with

Mannhalt but never told him that it created a potential conflict of interest and never warned Mannhalt of the dangers of continued representation. The trial court was unaware of the conflict and thus never discussed it with Mannhalt. *Cf. United States v. Powell,* 708 F.2d 455, 456–57 (9th Cir.1983) (finding waiver where conflict discussed in detail in open court), *rev'd on other grounds,* 469 U.S. 57, 69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *United States v. Partin,* 601 F.2d 1000, 1007–08 (9th Cir. 1979) (same), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980). We do not condone the practice of a defendant remaining silent when he in fact knows of a conflict of interest. But on the record before us, we cannot find that Mannhalt was informed and aware of the risks associated with Kempton's representation. We, therefore, do not find a waiver by Mannhalt of the possible conflict between himself and Kempton.

■ We turn now to the application of the *Cuyler* standard to the facts of this case. We must first determine whether an actual conflict existed. We find that when an attorney is accused of crimes similar or related to those of his client, an actual conflict exists because the potential for diminished effectiveness in representation is so great. For example, a vigorous defense might uncover evidence of the attorney's own crimes, and the attorney could not give unbiased advice to his client about whether to testify or whether to accept a guilty plea. *See United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984) (counsel may have conspired with someone connected to defendant or similar fraudulent insurance claims and thus actual conflict existed); *see also United States v. Salinas,* 618 F.2d 1092, 1093 (5th Cir.) (trial judge was within discretion in disqualifying attorney over defendant's objection where attorney was target of investigation concerning events for which clients were indicted), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980).

■ The second prong of *Cuyler* is whether the conflict adversely affected counsel's performance. Here, Morris' ac-

cusation against Kempton adversely affected Mannhalt's representation in four areas: 1) Kempton's failure to testify to rebut Morris' allegations, 2) Kempton's cross-examination of Morris, 3) Kempton's failure to question Mannhalt on direct about the allegations, and 4) Kempton's failure to explore possible plea bargains.

■ First, Kempton should have disqualified himself so as to be available to testify and dispute Morris' testimony about the stolen ring. The Washington State Rules of Professional Conduct (RPC) require that "[a] lawyer shall not act as advocate at a trial in which the lawyer ... is likely to be a necessary witness...." Washington Court Rules RPC 3.7. Moreover, the Model Code of Professional Responsibility in effect in Washington at the time of Mannhalt's trial required that defense counsel withdraw when "a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of a client...." Model Code of Professional Responsibility DR 5–102(A). The policy rationale behind this prohibition is to avoid placing the advocate in the unseemly position of arguing his own credibility to the jury. *Id.* at EC 5–9. In a recent Second Circuit case, the court found a conflict where defense counsel could have been called as a government witness to rebut and/or clarify the testimony of another government witness. *United States v. Iorizzo,* 786 F.2d 52, 57 (2d Cir.1986). Also, courts have disqualified counsel pretrial over the defendant's objections if it appears counsel will or should be called as a witness. *See, e.g., United States v. Kwang Fu Peng,* 766 F.2d 82, 86 (2d Cir. 1985); *United States v. DeLuna,* 584 F.Supp. 139, 146 (W.D.Mo.1984).

Here, the district court found that Kempton had no need to disqualify himself because his testimony would have been inadmissible as independent evidence to impeach on a collateral matter. In Washington, a trial court may permit a cross-examiner to inquire into collateral matters to test the witness' credibility, but the cross-examiner may not introduce evidence to show the answers are false. *State v.*

*Lahti,* 23 Wash.App. 648, 649–50, 597 P.2d 937, 938, *review denied,* 92 Wash.2d 1036 (1979). The test of collateralness is: "Could the fact to which error is predicated have been shown for any purpose independently of the contradiction?" *Id.* at 650, 597 P.2d at 938. Kempton's testimony may have been independently admissible to show Morris' motive—i.e. Morris was so desperate to get a plea bargain that he would even fabricate criminal conduct by Kempton. Moreover, Morris' accusations against Mannhalt and Kempton were factually intertwined. His accusations against both attorney and client were part of the same conversation with police officers and were documented in the same police report. In addition, Mannhalt was tried for possessing stolen property seized from his donut shop. Morris accused Kempton of buying stolen property at this same donut shop and Kempton admits that he bought a gold watch there.

Even if Kempton's testimony would have been inadmissible, his cross-examination of Morris put his own and his wife's unsworn testimony before the jury. Kempton told the jury that he did not buy a stolen ring. Although the jury was instructed not to consider these comments as evidence, Kempton put himself in the position of arguing his own credibility, precisely what DR 5–102(A) seeks to avoid. *Accord Iorizzo,* 786 F.2d at 57 (whether or not attorney testified, his firsthand involvement would cause any argument to jury about testimony to be viewed as a statement of a witness as well as of an advocate).

Second, Morris' accusation against Kempton adversely affected Kempton's cross-examination of Morris. Kempton's personal interest in preserving his reputation and avoiding criminal prosecution may have impacted the manner of the cross-examination.[1]

Once Kempton decided to question Morris, both he and Mannhalt had an interest in undermining Morris' credibility. The manner of the cross-examination indicated, however, that Kempton was motivated, at least in part, by personal concerns. The examination was by all accounts unorthodox. Kempton admitted that he was shaken and furious. Kempton's emotional performance may have effectively discredited Morris in the eyes of the jury. It is equally likely, however, that the jury viewed Kempton's anger as implying that Kempton and possibly his client were involved in illegal conduct. Kempton's personal feelings about Morris' allegation may have thus adversely affected his performance.

Third, having brought out Morris' accusation on cross, Kempton could have asked Mannhalt about it on direct examination. Mannhalt suggests Kempton did not do so because he feared the prosecution would elicit on cross that Kempton had purchased a watch from Mannhalt. Kempton claims that Morris had been so thoroughly discredited that no further refutation was necessary.

After reviewing the cross-examination, we are not convinced that refutation by Mannhalt was unnecessary. As noted above, the jury could have inferred from Kempton's emotional cross-examination that Morris' accusation was true. This impression may have been bolstered by the fact that neither Kempton nor Mannhalt denied the allegation in sworn testimony. Kempton's decision not to question Mannhalt thus may have been affected by Kempton's personal concerns.

Finally, because Kempton was the target of the same criminal investigation, he may not have pursued a plea bargain in which Mannhalt would agree to testify against Kempton. Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest. *See Holloway v. Arkansas,* 435 U.S. 475, 490–91, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978).

---

**1.** Mannhalt also argues that Kempton's personal interests affected his decision whether to ask Morris about the accusation. Kempton claims he questioned Morris on cross because he feared the accusation would come out on redirect and because he thought it was good impeachment material. This explanation seems plausible. Kempton's personal interest would have probably been to avoid mentioning the allegation at all.

According to the deposition of state prosecutor Evans, the state was very interested in Morris' information about Kempton and considered pursuing it.

A: [by Evans] First, when I was made aware of this, I went, "bingo" And I will not go into this in great length but, clearly, I had been told for many years previous that your client was an important fence. You could sit outside and see the stuff go in. One of the big questions everybody has already had was where did it go? You know, very simple.

Well, if you could show that he had clientele of upper-class, professional people in town, that would explain a lot of things. So, as a prosecutor, I was terribly interested in this piece of information. And I cannot speak for the police, I have no idea, but I know I leaned on them hard to do everything they could to chase that down, to put it to rest, one way or the other.

Secondly, because by the time that I was really aware of this—and this has to be mid-November, late November—it is clear that Kempton is now going to represent Guenter, both in Whatcom County and potentially here, in any case, that is developed against him. Well, you know, that raises some issues that we are here to talk about.

To me, it was apparent that I had to do something with that information, cleanly. Either wind up charging the man or exonerating him, if I could, whichever, chasing it down. I essentially put it to the police in those terms.....

Q: Mr. Evans, relative to Mr. Morris' accusation against Mr. Kempton, did you ever see that as a conflict of interest for Mr. Kempton?

A: Initially, I did. Clearly, if there was any merit to it, he could not—number one, he was going to get prosecuted if I could corroborate, maybe even turn the tables and offer Guenter a deal. Look, and this is straight, I would have done so. Maybe not against all the charges, but we would have made some accommodation.

The district court found that this potential conflict never became an actual conflict because the prosecution never offered Mannhalt any such deal and because Mannhalt did not have any information to corroborate Morris' story. The fact that no offer was made is irrelevant—the prosecutors could not possibly have approached Mannhalt with a deal to give information about Kempton once Mannhalt retained Kempton as his attorney. And although Mannhalt could not corroborate Morris' story about the stolen ring, he could have told prosecutors about the watch Kempton purchased and conceivably been granted some leniency.

Although it is impossible to speculate what the prosecution would have done if Mannhalt had not retained Kempton, it is clear that Kempton did not pursue a plea bargain that might have involved revealing incriminating information about himself. Therefore, a conflict adversely affected Kempton's performance.

In sum, Kempton faced two potential conflicts in his representation of Mannhalt. First, he had twice previously represented Morris, a key government witness. This was not an actual conflict, however, because the first case was unrelated, and Kempton's appearance at the arraignment and line-up in this case did not involve any privileged communication. Second, Morris had accused Kempton of criminal conduct related to the robbery and stolen property charges for which Mannhalt was being tried. This created an actual conflict and likely affected Kempton's performance in four ways: he could not call himself as a witness to refute Morris' accusations but his cross-examination included much of his own unsworn testimony, he cross-examined Morris in an unseemly and emotional manner, he did not question Mannhalt about Morris' accusation on direct, and he could not pursue a plea bargain that might implicate himself. Mannhalt has thus met the requirements of *Cuyler* and shown a violation of his sixth amendment right to effective assistance of counsel.

We add a final note. The prosecution here was fully aware before Mannhalt's

trial began of Morris' accusation against Kempton. The prosecution, therefore, had ample opportunity to bring the potential conflict to the trial judge's attention and move for disqualification if appropriate. Such a process would have also enabled Mannhalt if he so desired to waive any conflict on the record after adequate warning. We trust that this opinion will ensure a pretrial disposition of such conflict of interest issues in the future.

## IV.

## CONCLUSION

We REVERSE the district court's grant of summary judgment in favor of respondent Reed, GRANT petitioner Mannhalt's motion for summary judgment and REMAND to the district court for the grant of a conditional writ. The state is permitted 90 days from this remand to refile.[2]

REVERSED AND REMANDED.

---

**2.** Because we grant Mannhalt's petition for writ of habeas corpus on sixth amendment grounds, we do not reach his argument that the jury instructions on accomplice liability violated due process.