# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 13, 2010 Session

## STATE OF TENNESSEE v. CASSANDRA HENDRICKS FRANKLIN

### Direct Appeal from the Circuit Court for Tipton County
### No. 5975     Joe H. Walker, III, Judge

### No. W2009-01087-CCA-R3-CD  - Filed June 3, 2010

The defendant, Cassandra Hendricks Franklin,[1] was convicted by a Tipton County jury of first degree premeditated murder and sentenced to life imprisonment. In a timely appeal to this court, she argues that the evidence was insufficient to sustain her conviction and that the trial court erred by denying defense counsel's motion to withdraw from representation. Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Lyle A. Jones (at trial and on appeal) and David S. Stockton (at trial), Assistant Public Defenders, for the appellant, Cassandra Hendricks Franklin.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and P. Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's April 21, 2008, fatal shooting of her boyfriend, Marcus Jackson, which resulted in her indictment for first degree premeditated murder. The

---

[1] The defendant is also known by the name "Sandra Hendricks Franklin," which is the name under which she was indicted in this case.

defendant was tried before a Tipton County Circuit Court jury from April 6-7, 2009.

## State's Proof

Mary Ballard, the victim's aunt, who at the time of the shooting was living in a Tipton County home with the victim, the defendant, the defendant's daughter, and several other individuals, testified that she was awakened on April 21, 2008, by the sound of two gunshots followed by the victim's voice calling, "Auntie, this bitch done shot me. Come call 9-1-1." When she left her bedroom, she saw the victim in the hallway lying bent backwards with his knees under him and his hands in the air and the defendant walking down the street outside.

According to Ballard, the defendant and the victim had frequent verbal altercations involving profanity and yelling, but she never saw the couple engage in any physical violence toward each other. Two or three days before the shooting, however, the defendant asked her if she had ever been to jail and, when she said no, said, "I'm going." She asked her why, and the defendant replied,"I'm going to kill your nephew." Ballard said that at the time the conversation "went in one ear and out the other"because she did not think the defendant was serious. On cross-examination, she testified that she had not remembered the conversation until the Thursday before trial when she was interviewed by the prosecutor.

Shanitra Freeman, a neighbor of the victim and the defendant, testified that the defendant came to her home on April 21, 2008, awakened the witness's mother, told her that she had just shot the victim, and showed her where she had placed the gun.

Loretta Williams, Freeman's mother, testified that she was awakened on the morning of the shooting by the sound of her doorbell ringing. She said that the defendant, who was repeatedly calling her name, came into her bedroom and told her that she had just shot the victim. The defendant then walked outside and showed her that she had placed the gun behind the tire on Williams' van. Williams testified that she told the defendant not to leave the gun there and instructed her to unload the weapon. The defendant complied, removing the clip from the gun and throwing it on the ground before placing the gun on the ground. The defendant then asked Williams to watch her daughter, Diamond, but Williams refused and instead telephoned the defendant's sister. Williams testified that the defendant was dressed in a gown but was not wearing a bra and that she told her,"You know you're going to jail," to which the defendant replied, "Yeah." Williams said she told the defendant to wait while she got her a shirt and that when she returned with the garment, the defendant put it on, picked up the unloaded gun, and began walking to her sister's house.

On cross-examination, Williams clarified that the defendant was dressed only in pajama bottoms and a housecoat without a bra. She also said that the defendant was nervous and did not appear to be in a "right state of mind."

Sergeant Dawn Wright of the Mason Police Department, the first officer to arrive on the scene, testified that the victim was gurgling, but not breathing, when she got to the house. Other first responders arrived within two minutes and she assisted in their attempts at CPR, but they were unsuccessful and the victim died at the scene.

Officer Specht of the Mason Police Department testified that he responded to the scene to find the defendant walking across the backyard of a nearby residential property carrying a gun with a black coat draped over her arm. He said he yelled at her to put the gun down and to get down and that she dropped the gun and fell to the ground in one motion. The defendant later asked him if a .40 caliber would kill somebody, and he replied that any gun would kill anybody. On cross-examination, he acknowledged that the defendant admitted that she had shot the victim and told him that she "wanted to comply."

Special Agent Mark Reynolds of the Tennessee Bureau of Investigation ("TBI") identified the semi-automatic weapon, the clip to the weapon, and the defendant's black jacket, all of which he recovered from the crime scene and turned over to TBI Special Agent John Sullivan.

TBI Special Agent John Sullivan testified that he submitted for analysis the Smith & Wesson handgun and black hooded jacket he received from Special Agent Reynolds, two shell casings recovered from the crime scene, and two spent bullets recovered from the victim's body. He described the victim's body as being in an "awkward position," stating that "[i]t appeared as though he had fallen to his knees and fell backwards." He also identified the defendant's April 21 statement, which was admitted as an exhibit and read aloud to the jury. The statement reads in pertinent part:

> [The victim] woke up acting shitty. He was verbally abusive and yelling at me. He was hitting on me because I was smoking in the bathroom. He told me, "Close the bathroom door you stupid bitch!" I told him, "Your mom is a stupid bitch!" He came in the bathroom and grabbed me by my hair. He hit me in the head with his fist at least three times. He kept calling me a stupid bitch. After he beat me he went into the living room and started ironing his clothes. I went into our bedroom and got the gun from under the mattress. I went into the living room with the gun and started screaming "Fuck you! Fuck you!" After the first "fuck you" he turned around. After I said it the second time he start[ed] walking towards me. I was holding the gun with two hands because it is very powerful. I was pointing it at [the victim]. I felt like he was coming towards me to hit me. He looked like he didn't think the gun was loaded.
>
> I have never shot his gun before. When he came towards me I shot

-3-

once. He fell to the floor. I ran out the door. When he fell he started screaming in pain. I didn't want him to die. I love this man but he's put me through so much bull. After I shot him I walked to my sister's house. I had the gun. I took the clip out of the gun and put them under my sister's bar-b-que. The police came and arrested me. I wasn't trying to hide. I was trying to get away from his house.

I had on a black hoodie sweater when I shot [the victim]. When I left the house I took it off to cover the gun up.

A few nights ago [the victim] whipped my daughter Diamond with the brown cord I hid behind the dresser. [The victim] whipped Diamond because she ate some food of his. Last night [the victim] told Diamond he was going to whip her when he got back from his sisters. Me and Diamond hid the cord. [The victim] came back acting all nice with ice cream. Last year sometime, maybe September, [the victim] slapped Diamond in the face and left a hand print on her cheek.

There has been a lot of stuff going on that makes me think [the victim] has been molesting Diamond. A few months ago Diamond said it hurt when she peed. One time when I left the bedroom and came back Diamond was laying next to [the victim] in the bed under the covers. Diamond jumped up like something was going on. Sometimes she'll be sitting on his lap and jump off when I walk in like something was going on. Diamond never told me [the victim] was molesting her. She was molested in California when she was three.

Agent Sullivan testified that he observed no bruising, abrasions, or other marks on the defendant's face or head, despite conducting a careful and close examination of her head and neck area.

Samantha Owens, a friend of the victim, testified that the victim briefly introduced her to the defendant approximately a week before the shooting and, on April 20, 2008, brought the defendant and her daughter by Owens' house for a visit. Owens said that her third encounter with the defendant took place approximately two weeks prior to the defendant's trial, after Owens had been arrested and taken to the Tipton County Jail. The defendant asked if she remembered her, and she replied that she did not. The defendant then told her that she was the one who had killed the victim and that she had done it because he had touched her daughter.

Roderick Fleming, the victim's cousin, testified that a few days before the shooting,

he was with the defendant, the victim, and Mario Fleming when he heard the defendant say that if she ever caught the victim "messing with" Samantha Owens she would kill him.

Mario Fleming testified that a few days before the shooting, the defendant asked him if the victim had been "messing with that white girl." He said that he knew the defendant was referring to Samantha Owens because the victim had earlier given Owens a hug in front of the defendant. He stated that he answered the defendant, "No, not that I know of." The next day, the victim and the defendant were again at his home when the defendant said that if she caught the victim messing with Owens, she would kill him. The witness said that a day or two prior to the shooting, he was at Owens' house when the victim, the defendant, and the defendant's daughter came to visit. The defendant did not say anything at that time but, according to the witness, exhibited "an attitude."

Tina Stahl testified that she and the defendant shared a room at the Tipton County Jail for approximately three months and grew to be close. She said that after they had known each other a few weeks, the defendant told her that she had murdered the victim because he had molested her little girl. Two or three weeks later, the defendant asked her if she knew how to talk to someone through the glass without using the telephone, because conversations over the telephone were recorded. Stahl said she suggested that the defendant could lip synch the words or write the message on a piece of paper.

Later that same night, the defendant told Stahl that the victim had not really molested her daughter and that she had killed him because he wanted another woman. According to Stahl, the defendant related the following: that the victim, who had been out all night, came home and told her to get her "fat ass" out of his house and that he did not want to be with her anymore; that she jumped out of bed, picked up the gun, and shot him three times as he was turning to walk out the bedroom door; and that she would have killed everyone else in the house because they were witnesses, but the gun jammed. Stahl testified that the defendant asked her to go to her sister's house when she got out of jail and ask the defendant's daughter to please say that the victim had molested her so that the defendant would not have to spend the rest of her life in jail. Stahl said the defendant wrote her sister's cell phone number on a piece of paper and gave it to her. She identified the scrap of paper, which she said was part of a commissary receipt with the defendant's signature, and the paper was subsequently admitted into evidence as exhibit number 22.

Stahl further testified that during the time that they were roommates, the defendant spoke of the victim every night, saying "really ugly things" about him and at one point relating a dream in which she had cut the victim's body into small pieces. Stahl said that when she suggested that the defendant should let the victim rest in peace, the defendant responded, "Rest in peace, my ass. He can rest in piss." Stahl stated that she reported what

she knew to law enforcement in September 2008 because she thought it was the right thing to do. When asked why she had been in jail, she explained that she had had "[a] worthless check and a tampering with evidence charge that was dropped to a theft under $500." She denied that she had been promised anything in exchange for her testimony or released early from jail, testifying that she had "flattened" her sentence, serving from June 25, 2008, until March 1, 2009. She also denied that anything had happened to make her want to retaliate against the defendant or that she had any "ax to grind" against her.

On cross-examination, Stahl acknowledged that the tampering with evidence charge arose as a result of her actions as a confidential informant when she was supposed to make an undercover drug purchase but instead took the county's money and the drugs. She further acknowledged that her children were taken from her as a result of her actions, but she denied that it had anything to do with her decision to come forward with the information about the defendant. Finally, she stated that the defendant was obsessed with death and agreed that she probably "was having some kind of mental issues" during the time she shared a room with her at the jail.

Sandra Miller, who said that she and the defendant were cell mates at the Tipton County Jail for three months, testified that one night the defendant woke up screaming that she had not meant to kill the victim and that he had been cheating on her. She, like Stahl, testified that the defendant reported that she had dreamed of cutting up the victim's body, spoke of the victim's resting "in piss" instead of "in peace," and related that she had intended to shoot the witnesses to the murder, but her gun had jammed. On cross-examination, she acknowledged that she and Stahl had been in jail together but denied that they had "swap[ped] stories."

Shelby County Assistant Medical Examiner Dr. Miguel Laboy, who performed the autopsy of the victim's body, testified that the cause of death was gunshot wounds to the chest. The victim had the following injuries: a gunshot wound to the chest of indeterminate range that perforated the heart and lung and fractured ribs and the thoracic spines; a gunshot wound to the left elbow of indeterminate range; and a gunshot wound to the left chest of indeterminate range, which could have been a reentrance of the bullet that caused the gunshot wound to the left elbow, that perforated the liver, the stomach, and the small bowel and lacerated the left kidney. Dr. Laboy estimated that someone with the type of gunshot wound to the heart sustained by the victim would die "within seconds to minutes." He also said that the toxicology report on the victim was negative for drugs and alcohol.

TBI Special Agent Forensic Scientist James Russell Davis, II, an expert in gunshot residue, testified that his analysis revealed the presence of gunshot primer residue on the defendant's hooded jacket.

TBI Special Agent Alex Brodhag, an expert in firearms examination, identified the weapon involved in the case as a functioning Smith & Wesson .40 caliber semiautomatic pistol and testified that the two cartridge cases and the two bullets submitted for analysis had been fired from that gun.

**Defendant's Proof**

TBI Special Agent John Sullivan, recalled as the first witness for the defense, testified that as a result of his interview with the defendant's daughter, Diamond Franklin, he contacted the Department of Children's Services ("DCS"). He said he did not observe any injuries on the child but did not examine her. On cross-examination, he explained that he was required to notify DCS whenever there was any allegation of child abuse, regardless of the proof.

Diamond Franklin, the defendant's nine-year-old daughter, testified that she never saw the defendant hit the victim, but did see the victim hit the defendant. She further testified that the victim had once spanked her on her arms and legs with a green cord because she would not go to sleep and that the spanking left marks, which she later showed to "[t]he social security worker and [her] teacher." On cross-examination, she said she did not remember having told Agent Sullivan that she had never seen the victim hit the defendant but had seen the defendant hit the victim.

Sharon Bramlett, the defendant's sister, testified that she had observed on Diamond "some scarring from something that hit her on her legs and on her arms." On cross-examination, she identified the phone number on exhibit number 22 as her unlisted phone number.

Miakia Nathaniel, a DCS case manager, testified on direct and cross-examination that she observed some scratches or welts on Diamond Franklin's arms and legs on April 21, 2008, which Diamond initially explained as the result of a stray dog's having scratched her on her legs. She said that when she spoke to her again on April 25, Diamond told her that the marks were the result of having been spanked by the victim. Nathaniel stated that she did not know if Diamond had spoken to the defendant in the interim or why she had changed her story.

Claudette Nelson, the defendant's mother, testified that she once saw the victim throw the defendant out of his car, which left bruises "all over [the defendant's] arms and things." On cross-examination, she said that the defendant never told her that Diamond was being abused and that if she had, she would have insisted that she leave the victim's home and come stay with her.

-7-

**State's Rebuttal Proof**

TBI Special Agent John Sullivan testified that Diamond Franklin told him in an interview that she had never seen the victim hit the defendant but had seen the defendant hit the victim.

Following deliberations, the jury convicted the defendant of the first degree premeditated murder of the victim as charged in the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the convicting evidence, arguing that there was insufficient proof that she premeditated the killing. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

Citing her statement to police and her daughter's trial testimony, the defendant argues that the evidence was insufficient to show premeditation and instead supports a finding that she was sufficiently provoked by the defendant's beating of her daughter and herself to act in an irrational manner. We respectfully disagree.

Viewed in the light most favorable to the State, the evidence showed that in the days before the shooting the defendant exhibited her anger and jealousy at the victim's relationship with Owens and stated to both Roderick and Mario Fleming that she would kill the victim if she found out that he was cheating on her with Owens. During this same time

frame, she also told the victim's aunt that she was going to kill the victim. The victim was unarmed at the time of the shooting, and the investigator who interviewed the defendant that same day was unable to detect any signs of her having been recently beaten, as she claimed in her statement. The defendant later confessed to her cell mates that she had killed the victim not because he was molesting her daughter but, instead, because he intended to leave her for another woman. Finally, the defendant attempted to enlist the aid of one cell mate in coaching the defendant's daughter to corroborate the defendant's story that the victim had molested the daughter. From all of this evidence, a rational jury could have reasonably found that the defendant was not acting under provocation at the time she shot the victim but instead premeditated the killing. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for first degree premeditated murder.

## II. Denial of Trial Counsel's Motion to Withdraw

The defendant next contends that the trial court erred in denying her trial counsel's motion to withdraw from representation. On March 17, 2009, defense counsel filed a motion requesting that both he and the public defender's office be allowed to withdraw from representation due to a conflict of interest. Among other things, he asserted that: the State had just served him with notice of additional witnesses, including Tina Stahl; that he had previously represented Stahl in both criminal and juvenile court and was in possession of information gained during the course of his representation that "would give rise to a conflict under Rules 1.6, 1.7 and 1.9 of the Rules of Professional Conduct"; and that his conflict imputed to the entire public defender's office.

At the March 19, 2009, hearing on the motion, the trial court noted that the public defender's office had a number of employees and a huge volume of cases and would not "be representing many people" if allowed to conflict out "just because at one time they've represented someone in the past that happens to be a witness in the case." Defense counsel responded that his conflict of interest went beyond having merely represented Stahl in the past, in that he was in possession of valuable impeachment information that he had gained during the course of his representation of Stahl but would be unable to use in his defense of the defendant. He declined, however, to reveal the substance or exact nature of the information, citing attorney-client privilege.

The decision to allow counsel to withdraw lies within the discretion of the trial court and will not be reversed absent an abuse of discretion. See State v. Branam, 855 S.W.2d 563, 566 (Tenn. 1993); State v. Gilmore, 823 S.W.2d 566, 569 (Tenn. Crim. App. 1991). It is unquestioned that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." State v. Thompson, 768 S.W.2d 239, 245 (Tenn. 1989). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and

loyalties.'" State v. White, 114 S.W.3d 469, 476 (Tenn. 2003) (citing State v. Culbreath, 30 S.W.3d 309, 312-13 (Tenn. 2000) (quoting Tenn. Sup. Ct. R. 8, EC 5-1)).

In State v. David Michael Chubb, No. M2005-01214-CCA-R3-CD, 2007 WL 258429 (Tenn. Crim. App. Jan. 29, 2007), cited by the defendant, this court recognized that a conflict of interest may arise not only in simultaneous representation cases but also in cases of successive representation "when an attorney who once represented a co-defendant or witness currently represents the accused." Id. at *14 (footnote and citations omitted). We further recognized, however, that demonstrating an actual conflict of interest in the latter situation is generally difficult:

> Demonstrating an actual conflict of interest is generally more difficult in a successive representation case than in a simultaneous representation case. See Enoch v. Gramley, 70 F.3d 1490, 1496 (7th Cir. 1995); Smith v. White, 815 F.2d 1401, 1405 (11th Cir. 1987).
>
> One of the chief concerns in successive representation cases "is the possibility that the attorney may use or divulge on behalf of the new client confidential or privileged information obtained from the former client." [State v.] Coulter, 67 S.W.3d [3,] 29 [(Tenn. Crim. App. 2001)]. Successive representation may result in an actual conflict "'if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.' A corollary danger is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." Enoch, 70 F.3d at 1496 (quoting Mannhalt v. Reed, 847 F.2d 576, 580 (9th Cir. 1988)). Actual prejudice can be found if "(1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case." Smith, 815 F.2d at 1405.

Id.

In this case, the trial court denied the motion on the basis that counsel had failed to show any conflict of interest that would hinder his zealous representation of the defendant. The trial court's ruling states in pertinent part:

> [T]he State alleges that the lady you used to represent, Ms. Tina Stahl, gave a sworn statement alleging that the defendant told her that she had shot the victim because he was cheating on her and because he told her to get her fat

ass out of his house.

So I can't imagine what your conflict really would be because that's not -- the fact that you had represented her before, unless you're willing to say, "I know she's a liar and you can't believe anything she says," I mean, that could be the only conflict that I can think of.

We find no abuse of discretion in the trial court's ruling. We, like the trial court, fail to see how counsel's earlier representation of Stahl on unrelated matters created a conflict of interest that would have prevented counsel from adequately representing the defendant's interests. In this respect, we note that counsel conducted a vigorous cross-examination of Stahl at trial, questioning her about her behavior in her tampering with evidence case, her addition to crack cocaine and the fact that she had failed a drug test while on probation, her motivation for coming forward with the information, and the fact that her children had been removed from her custody. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE